Blake D. Miller (4090)
**MILLER TOONE, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: (801) 363-5600
Facsimile: (801) 363-5601
E-mail: miller@millertoone.com


Attorneys for the Debtor

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: <br><br> **SLC INN, LLC** <br><br> **Debtor.** | **Bankruptcy Case No. 14-30634** <br> **Chapter 11** <br><br> **Honorable _____** <br><br> **(Filed Electronically)** |

---

### DECLARATION OF WOLTER MEHRING IN SUPPORT OF FIRST DAY MOTIONS

---

I, Wolter Mehring, hereby declare as follows:

1.     I am over the age of 18 have personal knowledge of the matters stated herein.  I make this declaration in support of the motions and applications requesting various types of relief (collectively, the "First Day Motions") filed by the Debtor, SLC Inn, LLC.

2.     I am the President of SLC Hotel Corporation, a Delaware corporation.  SLC Hotel Corporation serves as the manager of SLC Inn, LLC.  In such capacity, I am fully cognizant of all facets of the Debtor's operations.  If called upon to testify as to the content of this Declaration, I could and would do so.

3.      On October 6, 2014, the Debtor filed a voluntary chapter 11 petition for relief. The Debtor filed the First Day Motions to allow it to operate effectively in this Chapter 11 case. The relief sought in the First Day Motions are critical to the Debtor's business operations, will allow for a comprehensive and smooth transition into Chapter 11 and will ensure that the Debtor is provided the best opportunity to reorganize successfully.

4.      I have reviewed and am generally familiar with the contents of the following First Day Motions.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in this chapter 11 case with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to the Debtor's successful reorganization and are in the best interest of the Debtor and its creditors.

## BACKGROUND

1.      On October 6, 2014, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtor continues to operate as a debtor-in-possession pursuant to §1107  and §1108 and no trustee or committee has been appointed in this case.

3.      The Debtor is the owner of the Comfort Inn, Salt Lake City Airport (the "Hotel").  The Hotel is a 155 room full service hotel located at 200 N. Admiral Byrd Rd., Salt Lake City, Utah 84106.  The Hotel has over 2,500 square feet of flexible event space and has a full restaurant – the Cedar Creek Grill.

4.      The Hotel is managed and operated by SLC Hotel Corporation, a Delaware corporation.  SLC Hotel Corporation serves as the Manager of the Debtor LLC pursuant to the Debtor's Operating Agreement.

## EVENTS LEADING TO BANKRUPTCY

5.       In 2006, Zions First National Bank provided the Debtor with a $3.8 million first mortgage loan to refinance an existing secured note obtained from the company that sold the Hotel to the Debtor in 2001.  In 2007, the Zions Bank loan was increased to $4.5 million.

6.       By late 2009, the hotel business in the United States weakened significantly and, in the hotel sub-market in the SLC Airport International Center, several new hotels opened, further impacting the Debtor's hotel.

7.       In 2010, Zions Bank and the Debtor made an agreement regarding repayment of the Zions' obligation (the "2010 Agreement").  In reliance on the 2010 Agreement, the Debtor raised the necessary funds and paid all monthly payments and property tax installments.

8.       Despite the 2010 Agreement, Zions Bank continued to claim Debtor was not in compliance with the debt coverage ratio and threatened to charge an additional 3% default interest. The Debtor, however, continually disputed Zions Bank's position.

9.       On July 18, 2013, Zions Bank declared a non-monetary loan default based on the asserted non-compliance of the debt service coverage ratio contained in the original loan documents.  Zions informed the Debtor it would charge default interest of 3% beginning August 5, 2013.  At this time, Zions Bank demanded that the Debtor either to pay off the loan in full or pay the loan down by $2 million (approximately 50% of the loan balance) or provide personal guarantees.  The Debtor disputes the validity of these actions by Zions Bank.

10.       On May 12, 2014, Zions recorded a notice of default, based on its prior asserted debt service coverage default and the imposition of default interest.

11.       On August 28, 2014, Zions Bank served a Notice of Trustee's Sale.

12.      The Debtor has recently received a voice mail message from Zions Bank's counsel

that Zions Bank's rights under its loan documents with the Debtor were sold to an entity referred

to as "Wells Street Advisors."  The Debtor has received no formal notification of any assignment

of its loan with Zions Bank nor of any contact information for Wells Street Advisors.  In this voice

mail message, counsel for Zions Bank indicated that counsel would continue to serve as counsel

for Wells Street Advisors in connection with this matter.

13.      On September 29, 2014, the Debtor was contacted by a representative of the alleged

purchaser of the note.  The representative was informed of these facts, but the purchaser elected to

proceed with a trustee sale scheduled for October 8, 2014.

14.      The Debtor filed a voluntary Chapter 11 petition in this Court on October 6, 2014.

### **MOTION BY DEBTOR TO (A) PAY PREPETITION WAGES, SALARIES AND BENEFITS; AND (B) USE EXISTING PAYROLL ACCOUNTS, CHECKS AND ELECTRONIC TRANSFERS**

15.      The Debtor seeks authority to pay the outstanding wages and salaries owed to its

employees on the Petition Date, including unpaid or reimbursable expenses and benefits

(collectively, the "Pre-Petition Wage Obligations").  An itemization of the Pre-Petition Wage

Obligations is attached as Exhibit "A".  The total amount of the Pre-Petition Wage Obligations

is $17,409.60, of which $15,922.45 is wages and $1,487.16 is taxes.  None of the individual

Pre-Petition Wage Obligations exceed the $12,475.00 priority cap set forth in §507(a)(4) for

any particular recipient.

16.      As of the Petition Date, the Debtor employed approximately 24 full-time and 11

part-time employees.  None of the employees are insiders as such term is defined in §101(31) of

the Bankruptcy Code.

17.      The employees perform a variety of critical functions, including customer

service, management, marketing, sales, technical services, housekeeping, food and beverage service and other tasks. The employees' skill and their knowledge in understanding the Debtor's operations, customer relations and infrastructure are essential to the effective and continued reorganization of the Debtor's business.

18.     The Debtor contracts with ADP Payroll Services. ADP issues employee checks or makes direct deposits to employee bank accounts. ADP also prepares and files the necessary tax payments and tax reporting forms for the Debtor's payroll. ADP withdraws the requisite funds from the Debtor's bank account. Such funds include not only the employee wages, but the requisite tax payments and the ADP service fees. ADP charges $778. The ADP contract with the Debtor can be cancelled at any time, with 30 days prior notice.

19.     The Debtor has contemporaneously filed its Motion for Authority to Continue Bank Accounts and Business Forms requesting authority to continue utilizes bank accounts was to petition. Granting this relief will allow ADP to continue to effectuate the necessary transfers to fund payroll and payroll related expenses.

20.     Under the Debtor's standard payroll procedures, the Debtor's employees are paid in arrears twice a month, with payment occurring on the 20th of the month for work performed through the 15th and 5th of the month for work performed through the 30th of the preceding month. The Debtor's employees were last issued payroll checks on October 6, 2014 for the period ending on September 30, 2014.

21.     In the ordinary course of business, certain required payments on behalf of payroll taxes and employees' portions of FICA and FUTA and all legally ordered wage garnishments and/or domestic support obligations (collectively, the "Deductions") are deducted from employees' paychecks. The Deductions are paid to the applicable third party in accordance

with governing law.  The employee portion of the Deductions may constitute trust funds that are not property of the Debtor's bankruptcy estate.  In any case, the relevant taxing authorities hold a priority claim under §507(a)(8) for the tax portion of the Deductions.  As a result, creditors will not be prejudiced by the payment of the Deductions or the payment of employer portions of FICA and FUTA taxes associated with the Pre-Petition Wage Obligations.  The Debtor requests authority to pay the Deductions in the ordinary course of its business.

22.     The Debtor provides a competitive benefits package to its employees.  These benefits include paid vacations and holidays, paid sick and other leave and medical and life insurance benefits.  The Debtor also provides required workers' compensation benefits to its employees.

23.     The Debtor has established a variety of benefit plans and programs designed to assist its employee and their eligible dependents in meeting certain financial burdens, including those that may arise from illness, disability and death.  All full-time employees may participate in certain of the employee benefits programs.

24.     The Debtor offers all full-time employees basic medical insurance under a policy provided and operated by United Healthcare.  Approximately 5 employees are covered.  All premiums are paid on a cost sharing basis between the Debtor and the employees.  Under the medical plan, the Debtor pays 50% of the premiums per month and the employees pay the remaining 50% of the monthly premiums.  Contributions for dependents' health insurance are not paid]

25.     The Debtor also follows all federal COBRA laws and applicable state laws regarding health insurance, including continuation of coverage upon termination of employment if the employee so requests it.  The terminated employee is responsible for payment of the

premium with no cost to the Debtor.

26.    The Debtor provides worker compensation insurance for is employees at the

statutorily required level through Republic Indemnity.  The Debtor pays monthly premiums for

coverage under the worker's compensation insurance.  The next monthly premium in the amount

of $1640 is due on October 21, 2014.

27.    The Debtor requests authority to continue to maintain its worker's compensation

insurance in the ordinary course of business and to pay any and all Pre-Petition amounts relating

thereto, including, without limitation, any payment for worker's compensation claims,

deductibles, premiums and fees owed for administrative costs and other amounts required in

connection with the worker's compensation insurance, as such amounts become due in the

ordinary course of business.

28.    The Debtor reimburses employees who incur business expenses in the ordinary

course of performing their duties on behalf of the Debtor.  Such expenses typically include, but

are not limited to, parking and business related travel expenses, including transportation, auto

travel and car rental, lodging, meal charges, business lunches and entertainment expenses,

telephone charges and miscellaneous other allowed expenses.  An expense report detailing

expenses are submitted for reimbursement by the employee to the Manager and must be

supported by a reimbursement request with copies of receipts attached.  The Debtor seeks

authority, but not direction, to pay all such employee reimbursement expenses incurred prior to

the Petition Date and to continue to pay the employee expenses post-petition in the ordinary

course of business.

29.    The Debtor also requests the authority to honor, in the ordinary course of

business, unearned but unused vacation time and/or sick leave for employees that accrued prior

7

to the Petition Date.  The Debtor generally does not allow employees to cash out any accrued

vacation leave or sick leave, except in the case of termination.

### MOTION FOR AUTHORIZATION OF (1) THE INTERIM AND PERMANENT USE OF CASH COLLATERAL, (2) THE GRANTING OF REPLACEMENT LIENS, AND (3) ENTRY OF A SCHEDULING ORDER REGARDING CONTINUING USE OF CASH COLLATERAL

30.     Zions Bank, or its assignee ("Lienholder") claims, or is expected to claim, an

interest in the Debtor's cash collateral.  The Debtor has recently received a voice mail message

from Zions Bank's counsel that Zions Bank's rights under its loan documents with the Debtor

were sold to an entity referred to as "Wells Street Advisors."  The Debtor has received no formal

notification of any assignment of its loan with Zions Bank nor of any contact information for

Wells Street Advisors.  In this voice mail message, counsel for Zions Bank indicated that counsel

would continue to serve as counsel for Wells Street Advisors in connection with this matter.

31.     The market value of the Hotel, as an operating hotel, is approximately $65,000

per room or $10,075,000.

32.     The Debtor requests the use of cash collateral to make payments in accordance

with the budget attached as Exhibit "B" (the "Budget").  The Budget itemizes anticipated

receipts and expenses through December, 2014.  The Budget has been developed using historical

financial information of the Debtor.  The expenses itemized in the Budget are actual and

necessary costs to allow the Debtor to continue to operate the Hotel.

33.     The Debtor proposes that it be authorized to exceed the amounts budgeted for

individual line items on the Budget by up to ten percent.

34.     The Debtor has sufficient cash collateral to fund its operations during the budget

period.

35.    It is the Debtor's firm belief that approval of the ability for the Debtor to use cash collateral as set forth in the Budget is in the best interest of the Debtor, the Debtor's estate and its creditors.  The use of cash collateral will enable the Debtor to pay its post-petition obligations, maintain the continuity of management of the Hotel and preservation of the project's reputation as a well-run hotel while the Debtor reorganizes.

36.    Absent the use of the cash collateral, the Debtor would be required to cease operations, resulting in a disruption of services to guests, and significant diminution of value of the Hotel to the detriment of all parties.

## PREPETITION OBLIGATIONS TO CUSTOMERS AND GUESTS

37.    Guests who reserve a room at the hotel sometimes guarantees that reservation with a deposit made, typically made by credit card.  The Debtor is holding approximately 10 customer deposits totaling approximately $1,234.37.  None of the deposits held by the Debtor for any one guest exceeds $2,775.  In fact, most deposits are under $200 for each individual.

38.    The Debtor seeks authority, in its discretion, to continue to honor these reservation deposits in the ordinary course of its business.  The Debtor also seeks authority to return reservation deposits to those guests who timely cancel the reservations.  Honoring such obligations is essential to the Debtor to stay competitive in the industry and to minimize the impact otherwise caused by an inability to use these deposits.  Furthermore, the Debtor can avoid claims against the estate, which should be priority claims, and preserve its profits from the revenue from these guestrooms represented by the deposits.

39.    Without such relief, the Debtor's customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is critical to the Debtor's ability to reorganize for the benefit of all the parties in interest.

## MOTION FOR ORDER AUTHORIZING DEBTOR TO CONTINUE TO USE ITS EXISTING BANK ACCOUNTS AND EXISTING BUSINESS FORMS

40.     On the Petition Date, the Debtor maintained bank accounts with Wells Fargo and Zions First National Bank.  All the bank accounts were maintained at financially stable banking institutions with FDIC insurance.

41.     The Debtor intends to close the Zions accounts and only use the Wells Fargo accounts going forward.

42.     The Debtor maintains detailed and accurate records of all disbursements and transfers flowing through the bank accounts.

43.     A substantial portion of those receipts are through credit card payments.  Those credit card payments flow through the Wells Fargo operating account.

44.     If the motion authorizing the Debtor to continue to use its bank accounts is granted, the Debtor will not pay any pre-petition debts other than as authorized by the Court.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated this 7th day of October, 2014.

_____
Wolter Mehring